
# EXHIBIT A

# National Council of HUD Locals
AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES
AFFILIATED WITH AFL-CIO

## Council 222

September 28, 2018

J. Daniel Duran

Attorney Advisor

Federal Services Impasses Panel

1400 K Street, Suite 243

Washington, DC  20424-0001

RE:  18 FSIP 075

**By email to dduran@flra.gov**

Dear Mr. Duran:

Council 222 of HUD Locals would like to submit the following, in support of its position that it is not appropriate for the FSIP to assert jurisdiction over this matter at this time:

1. <u>The Parties Are Not at Impasse</u>

This is for three reasons: the proposals management is insisting upon impasse are unlawful implementations of Executive Orders found unenforceable by court order, impasse is premature because the parties have not bargained the issues to completion due to the Agency's bad faith, and underlying proposals are currently being litigated as grievances and negotiability disputes.

2. <u>Background</u>

The parties have had relatively few negotiation sessions, and those that we have had have been marred by the Agency's bad faith. The parties have only met three times, and during those meetings, the Agency has acknowledged that it was refusing to furnish counter proposals not because it had reached impasse but because the Agency believed three proposals-per side "seemed like a good number" and bargaining should not continue beyond that.[1]

The parties began negotiations on June 19, 2018, and negotiated for three days (June 19th, 20th and 21st). During the week of June 19th, Management presented its first set of Ground Rules proposals, which consisted of more than 40 separate proposals. The Agency was unable (or unwilling) to justify proposals, often refusing to explain the interest behind its proposals. A striking example: when asked to provide the basis for a ground rules proposal that all passbacks in term negotiations be limited to three in number, regardless of whether progress was being made, Management responded that this "seemed like enough," based on "experience" – despite the fact that none of management's team members had ever been involved in ground rules negotiations.

Despite Management's intentionally opaque initial proposals, the Union worked hard to draft counterproposals, which it delivered on June 21, 2018. The parties agreed to return to the bargaining table July 24th- July 26th (the mutual agreement to these dates almost a month later was the result of scheduling of management-initiated mid-term bargaining matters, the July 4th holiday, as well a management's "proposal" that the Union vacate its offices by July 15, 2018, to "comply" with the Executive Orders issues by President Trump).

---

[1] Agency Chief Negotiator, Katherine Hannah (a first time Chief Negotiator) not only insists upon a limit of "three passbacks" as a cap in ground rules proposals, but, on August 23rd, her designee, D'Andrea Hankinson, declared impasse because "three passbacks is enough" and that the Agency would not continue to negotiate.

2

At the July sessions the Union began, in good faith, to present its Initial Set of Proposals, responding to the numerous matters raised in Management's initial 40 plus proposals. While the Union was in the process of making its presentation of its Initial Proposals, Management called a mediator into the room, interrupting the Union's presentation. To emphasize: management called in a mediator to lay the groundwork for a premature declaration of impasse while the Union was providing its very first set of counter proposals. Management had no intent of engaging in negotiations.[2]

At the time the parties left the bargaining table on July 26, 2018, two additional bargaining sessions were scheduled for the weeks of August 7th and August 21st. The Agency was aware that almost the entire Union negotiating team was scheduled to be on leave from August 11th though August 17th, as Union team members were delegates to the National AFGE Convention and elections taking place in Las Vegas that week. Notwithstanding the fact that the Agency had agreed to come back to the bargaining table August 7th, the Agency filed with the FSIP on July 30, 2018.

The Union prepared a second set of proposals and presented them to management on August 8, 2018 (Union #2, attached). Union #2 reflected considerable movement, and progress. For example, the Union agreed to reduce the size of the negotiation team from nine members to seven members, as proposed by Management (Proposal #2). The Union also provided four alternate locations for negotiations, as management had refused to commit to the availability of the initial four locations proposed by the Union (Proposal #4). The Union also tried to

---

[2] As more fully discussed below, this behavior by management is the subject of a Grievance on bad faith bargaining, which will be before an arbitrator shortly.

compromise on matters related to Union Official Time for negotiations (Proposal #6) and proposed another compromise on travel expenses (Proposals #7A and 5B).

On August 21, 2018, the parties convened for the first of three scheduled negotiation days. The Agency responded with Management #3. On August 21, 2018, the Union responded with Union #3 (attached), again, a set of proposals showing significant progress. Despite the Agency's lack of movement on significant issues such as location of negotiations and travel expenses, the Union submitted alternate proposals aimed at resolving these failures of the Agency to engage in good faith negotiations. In particular, the Union tried to resolve the dispute over travel expenses by proposing a "cap" on Union travel expenses at a particular amount (Proposal #4). Notably, the Agency has consistently refused to negotiate on this issue, and its proposal remains unchanged from its Initial Proposal. In addition, the Union made significant movement on its proposal regarding Union Officials' release from job duties so they could negotiate the term contract (Proposal #6B). Again, Management consistently refused to move on this issue, claiming that the Union had no right to select negotiators of its choosing, but that any Union official allotted Official Time under the existing CBA could negotiate the term agreement.

Making every attempt to move the negotiations along, the Union presented Union #4 (attached) on August 23, 2018. Again, this proposal showed drastic movement by the Union. In particular, on the important issue of travel expenses for Union negotiators, and despite the fact that the Agency had failed to move whatsoever from its Initial Proposal, the Union offered yet another compromise: the Union offered to pay the travel expenses for two of its seven bargaining team members (Proposal #4B). The significance of this proffered compromise (as well as the Agency's refusal to negotiate at all on this issue) cannot be overstated. As discussed below, the Agency has failed to respond to an outstanding Request for Information from the

Union regarding the Agency's budgetary resources. However, it is believed that the Agency has a budget in excess of $43 billion. The Union has an annual operating budget of approximately $165,000. The Union represents locals throughout the country, including locals in Seattle, Portland, Fort Worth, and all over the South and Midwest; members of these locals have a right to be represented on the term contract bargaining team.

Following the Union's presentation of Union #4 and after a lengthy caucus, Management returned to the table on August 23rd, and stated arbitrarily "three passbacks is enough" and that the Agency would not continue to negotiate. Management walked away from the bargaining table on August 23, 2018, one day before the Federal District Court ruling, striking down many of the Executive Orders provisions on collective bargaining (see, AFGE, et al vs. Donald Trump, et al, U.S.D.C., District Of Columbia, Memorandum Opinion, August 25, 2018, hereinafter, "District Court decision").

On August 29, 2018, the Union asked the Agency to come back to the table to renegotiate, based on the court's ruling (see attached). The Agency refused, despite the fact that, as more fully discussed below, many of its proposals were based on provisions in the Executive Orders struck down by the District Court. Based on this egregious conduct by the Agency, the Union filed a Second Grievance, alleging bad faith bargaining (attached).

3. <u>Management's Proposals and Positions Were Based on Provisions of the Executive Orders Which Were Declared Illegal</u>

Management's proposals clearly tracked the directives of the Executive Order, and in some cases directly lifted language from the Executive Orders. For example, Proposal 7A of the

5

Agency's "Best and Final" offer contains specific and restrictive time constraints as to the number of weeks the parties would negotiate, regardless of the specific articles negotiated, and the length and complexity of those articles. These arbitrary time constraints are reiterated in Proposal 4 of the Agency's Best and Final.

This type of proposal is expressly prohibited by the District Court's decision:

> [S]uch preconceived notions of the 'ordinary' length of negotiations...are unwarranted, and ultimately unduly restrictive, because there is no such thing as a *typical* collective bargaining agreement....

District Court decision, pages 100-101.

Clearly, the conduct of the Ground Rules negotiations under the auspices of the Executive Orders, tainted the negotiations in the precise way discussed by, and prohibited by, the District Court decision. The Agency came to the table "wielding predetermined goals" rather than an open mind and sincere desire to reach an agreement, as required by the Statute. In several instances, when questioned at the bargaining table, Management's Chief Negotiator acknowledged the Executive Orders dictated their proposals as the compelling "guidance on how they [the Agency] should proceed." Clearly, management did not come to the table with an open mind, prepared to bargain - the very conduct prohibited by the District Court's decision (District Court decision, page 102). There is more bargaining to be done, and the Agency should be directed to resume the negotiations with an open mind. outside of the illegal constraints of the Executive Orders.

4. <u>The FSIP Has No Jurisdiction at this Point in Time</u>

FSIP has no jurisdiction over this dispute because a declaration of impasse which is premature is not valid.[3] The Agency's Request for Assistance to the FSIP acknowledges that a mediator was present during negotiations as an observer only. The Union has never met withe the mediator, as mediation is premature; the Union had a brief discussion with the mediator, at which time the Union made the point that they should be allowed to complete presentation of their initial proposals. The parties were exchanging proposals and making progress. It is a jurisdictional requirement that mediation take place before impasse proceedings go forward. The Agency should not be permitted to circumvent the process.[4]

5. <u>Pending Grievances and Negotiability Appeals Should Be Resolved Before the FSIP Asserts Jurisdiction</u>

As noted above, the Union has two grievances for bad faith bargaining based on the Agency's conduct during negotiations. The first is based on the clear "surface bargaining" approach taken by the Agency, seeking to engage a mediator before the Union had even presented its Initial Proposals (attached). The parties are already in the process of selecting an arbitrator for this first grievance. A Second Grievance alleging bad faith bargaining was filed by the Union in August 2018, based on the Agency's conduct in walking away from the bargaining table. When "management negotiators were more concerned with adherence to the unilaterally

---

[3] (5 USC 7119(b)). "Clearly, the Panel's jurisdiction is premised on the parties being "unable to reach agreement, notwithstanding their efforts to do so." Indeed, the Panel is obligated to "[d]decline to assert jurisdiction in the event that it finds that no impasse exists." Id. § 2471.6(a)(1)." Dept. of Commerce, Patent & Trademark Office v. FLRA, 26 F.3d 1148 (D.C. Cir. 1994).

[4] While the Agency's submission claims that the Union "caucused" with the mediator July 25th and 26, 2018, this is a deliberate misstatement on the part of the Agency. The Union spoke briefly with the mediator on those dates solely to advise that the parties were still negotiating, and that mediation was premature. No substantive discussions took place.

established time frames than with engaging in meaningful bargaining" the FLRA has found that these meetings constituted surface bargaining.[5,6]

The Grievance further alleges that management violated the act by setting arbitrary timelines seeking to limit the time and the table and amounts of counters,[7] and following other illegal dictates of the Executive Orders. The Agency's efforts demonstrate that the "ground rules were designed to impede, rather than further, the bargaining process," and the Agency "went to impasse during the ground rules negotiations because of its insistence.[8] There is clear authority stating that the legal obligation to bargain in good faith is breached when a party insists on ground rules that impede the bargaining process.[9]

In addition, the Union has a pending grievance based on the Agency's inadequate response to a statutory Request for Information needed to complete the negotiations (attached). The Union has just invoked arbitration on this matter.

---

[5] OPM's definition of "surface bargaining is that provided in *SSA*, 18 FLRA 511, 525 (1985), wherein a party's "entire course of conduct was not tied to the realities of the bargaining situation." *OPM Glossary of Fed. Sector Labor-Managements Relations Terms*, PN1703060608260977, 2003 WL 21729559, at *23 (June 1, 2003).

[6] *18 FLRA* at 524.

[7] The Authority has found proposals similar to those required under the E.O. ("8 weeks of bargaining from 'start to finish,'" along with a demand for "mutual agreement for additional unassisted bargaining" and where "the Agency placed in issue "every sentence" of the 190-page, term agreement containing 54 articles" it was established that "the proposed bargaining schedule constituted bad-faith bargaining in violation of the Statute." The Agency went on to "insist[] to impasse on a 8-week bargaining schedule" because "[a]mong the indicia of bad faith is insisting on reaching an agreement on ground rules proposals that indicate an intent to avoid the bargaining process." *United States Dep't of the Treasury, IRS*, 64 FLRA 426, 432 (Jan. 28, 2010).

[8] ." *U.S. Geological Survey Caribbean Dist. Office San Juan, Puerto Rico*,53 FLRA 1006, 1012 (1997)

[9] "As the obligation to bargain over ground rules is inseparable from the parties' mutual obligation to bargain in good faith, it is clear that a party may not insist on bargaining over ground rules which do not enable the parties to fulfill their mutual obligation. Stated simply, we conclude that ground rules proposals must, at a minimum, be designed to further, not impede, the bargaining for which the ground rules are proposed."." *U.S.D.A.F. H.Q., Air Force Logistics Command Wright-Patterson Air Force Base*,36 FLRA 524, 533 1990). The Authority has been clear that "imposing such onerous conditions, in the name of 'ground rules' which had to be resolved prior to bargaining on any Union mid-term proposals subverts the collective bargaining process." *Id.* at 527. *C.f. 375th Combat Support Grp. Scott Air Force Base, Illinois*, 46 FLRA 640, 666 (1992) (It is bad faith if "ground rule proposals are submitted as a means to further or to frustrate substantive bargaining.... [T]o allow such gamesmanship certainly frustrates the purposes of the Statute."))

A negotiability matter is also pending. On August 23, 2108, the Union delivered an Allegation of Non-negotiability to the Agency. The Union has now obtained outside counsel on this matter, and a Negotiability appeal was filed with the FLRA on September 24, 2018 (attached).

Finally, on September 12, 2018, the Union for the first time received data requested from the Agency concerning travel expenses paid in previous term negotiations (see attached). This new information will be the basis of new proposals by the Union, and negotiations should continue on this crucial issue, based on the new information provided. All these matters should be resolved before the FSIP assumes jurisdiction.

Should you require any additional information, do not hesitate to contact me.

*[signature: Holly K. Salamido]*

Holly Salamido, President Council 222 of HUD Locals

Cc:  by email Katherine.R.Hannah@hud.gov